**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| FABRIZIO MORELLI, derivatively on behalf of COMPASS MINERALS INTERNATIONAL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>KEVIN S. CRUTCHFIELD, et al.,<br><br>Defendants,<br><br>and<br><br>COMPASS MINERALS INTERNATIONAL, INC.,<br><br>Nominal Defendant. | Lead Case No. 2:24-CV-02496-EFM-ADM<br><br>**DEMAND FOR JURY TRIAL** |
| GEORGE ASSAD, Derivatively on Behalf of Nominal Defendant COMPASS MINERALS INTERNATIONAL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>KEVIN S. CRUTCHFIELD, et al.,<br><br>Defendants,<br><br>and<br><br>COMPASS MINERALS INTERNATIONAL, INC.,<br><br>Nominal Defendant | Case No. 2:25-cv-02186-DDC-ADM |

**VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**

## INTRODUCTION

Plaintiff Fabrizio Morelli ("Plaintiff Morelli") and Plaintiff George Assad ("Plaintiff Assad," and with Plaintiff Morelli, "Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant Compass Minerals International, Inc. ("Compass Minerals" or the "Company"), file this Verified Amended Consolidated Shareholder Derivative Complaint ("Amended Consolidated Complaint") against Kevin S. Crutchfield ("Crutchfield"), Edward C. Dowling, Jr. ("Dowling"), Lorin Crenshaw ("Crenshaw"), Jenny Hood ("Hood"), Richard P. Dealy ("Dealy"), Jon Chisholm ("Chisholm"), Jill Gardiner ("Gardiner"), Gareth Joyce ("Joyce"), Melissa M. Miller ("Miller"), Joseph E. Reece ("Reece"), Lori A. Walker ("Walker"), James Standen ("Standen"), and Shane Wagnon ("Wagnon") (collectively, the "Individual Defendants," and together with Compass Minerals, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Compass Minerals, unjust enrichment, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and for contribution against Defendants Crutchfield, Dowling, Crenshaw, Hood, and Standen under Sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' amended consolidated complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Compass Minerals, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Compass Minerals' current and former directors and officers from February 8, 2023 until March 25, 2024, both dates inclusive (the "Relevant Period").

2. Compass Minerals, headquartered in Overland Park, Kansas, provides essential minerals, such as salt products for roadway deicing, and plant nutrition products to improve the quality and yield of crops. The Company's products have numerous other applications across the consumer, industrial, chemical, and agricultural industries as well, including "next-generation fire retardants [that] help to slow, stop and prevent wildfires through the use of high-performing and environmentally friendly products."

3. After a period of close interrelation, in early May 2023, Compass Minerals completed the purchase of Fortress North America, LLC ("Fortress"), which the Company called "a next-generation fire retardant company dedicated to developing and producing a portfolio of magnesium chloride-based aerial and ground fire retardant products to help combat wildfires." On investor conference calls both prior and subsequent to the acquisition, the Individual Defendants represented that the motivation in purchasing Fortress was to introduce Fortress's aforementioned retardant products to market. It was represented as a primary growth opportunity for the Company. During the third quarter of the 2023 Fiscal Year,[1] Fortress entered into an agreement with the U.S. Forest Service ("USFS") to supply product, namely the fire retardant FRE-100 (the "Retardant")

[1] Compass Minerals' fiscal year does not mirror the calendar year, but instead begins on October 1 of each calendar year and concludes on September 30 of each calendar year.
For the period between October 1, 2021, and September 30, 2022, the "2022 Fiscal Year."
For the period between October 1, 2022, and September 30, 2023, the "2023 Fiscal Year."
For the period between October 1, 2023 and September 30, 2024, the "2024 Fiscal Year."

and provide associated services for the 2023 fire season. The USFS was Fortress's only primary client for that year.

4. To those relying on the representations of the Individual Defendants, this was indeed promising: until 2020, the only fire retardant in use by the USFS was an ammonium phosphate-based fire retardant named Phos-Chek, originally developed, trademarked, and marketed by Monsanto. When dropped from airplanes onto land threatened by a forest fire, Phos-Chek reacts with the vegetation so as to reduce its flammability and prevent the fire's spread. Spun-off by Monsanto in the 1990s, Phos-Chek is now currently produced and marketed by Perimeter Solutions.

5. The USFS essentially constitutes the entire American fire retardant market and is responsible for the vast majority of such product purchases. It also maintains the USFS Qualified Product List (the "Qualified Product List"), which enumerates all the fire retardant products approved for use in United States federal and state wildland. Candidates for the Qualified Product List must pass laboratory and then subsequent field evaluation by the USFS for inclusion on said list. Thus, if a fire retardant product fails to pass both laboratory and field evaluation, it is ineligible for inclusion on the Qualified Product List, consequently, cannot be used by the USFS, and ultimately lacks a market.

6. Despite these formidable barriers, the Company's apparent promise continued, at first: in May 2021, Fortress's Retardant became the first non-phosphate-based fire retardant to pass laboratory examination and gain conditional inclusion on the Qualified Product List. However, the first Operational Field Evaluation ("Field Evaluation") revealed a problem: the Retardant produced severe corrosion, and a difficult to remove precipitate compound, when comingled with Phos-Chek residue in airplanes' retardant tanks. The Company had only one solution: continue to work

with the USFS and set-up a subsequent Integrated Operational Field Evaluation (the "Integrated Evaluation") to address whether the Retardant's corrosion issue was corrected or circumventable. The Integrated Evaluation would, unlike previous laboratory tests, which had not found evidence of corrosion, purposely mix the Retardant with Phos-Chek in the operational environment to study the corrosion and precipitate that resulted from comingling the two compounds. This would determine whether the USFS would include the Retardant on its Qualified Product List, effectively determining whether it could be brought to market.

7. However, despite knowing that the Retardant's future was heavily dependent on the findings of the Integrated Evaluation (discussed in detail below), the Individual Defendants chose to conceal the testing process, the results of testing, and the Retardant's viability. Rather than inform investors of the impending Integrated Evaluation, the Individual Defendants answered questions about the Retardant's viability by referencing the laboratory tests, which succeeded specifically because involved no comingling of the Retardant and Phos-Chek, as in the Field Evaluation. Indeed, the Individual Defendants went so far as to characterize a USFS contract to purchase the Retardant as a major milestone in the course of the Company's regular business. In reality, however, the transaction was explicitly to conduct the Integrated Evaluation to determine whether the corrosion problems witnessed in the Field Evaluation could be solved or circumvented. This was not a deployment of the product in the course of successful business, this was a "last chance" test to determine if the Retardant was scientifically and commercially viable.

8. Throughout the Relevant Period, in breach of their fiduciary duties owed to Compass Minerals, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, in part, that: (1) testing of the Retardant had failed to establish it as a viable product, as its corrosive nature

had not been successfully mitigated; (2) a successful pending Integrated Evaluation of its product was required to secure the Retardant's viability; (3) the USFS purchase for the 2023 fire season was not a commercial accomplishment by Compass Minerals, but a purchase made to conduct the Integrated Evaluation; (4) as a result of the foregoing, the Individual Defendants overstated the prospects of the USFS awarding Compass Minerals a renewed contract for using the Retardant for the 2024 fire season; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an amendment to increase the number of shares available under the Company's 2020 Incentive Plan (the "Amended Incentive Plan"); and (6) in light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9. On March 25, 2024, the truth began to emerge, when, before the market opened, the Company issued a press release entitled "Compass Minerals Announces the Company Will Not Secure a USFS Contract to Supply Magnesium Chloride-based Aerial Fire Retardants for the 2024 Fire Season." Though it continued to present the severe corrosion and precipitate formation as a novel problem, the Company revealed for the first time that the Integrated Evaluation had failed, and that these problems continued to occur in the operational environment during the Integrated Evaluation.

10. On this news, the price per share of Compass Minerals stock fell $3.00, or 17.09%, from closing at a price of $17.55 per share on March 22, 2024, to close at a price of $14.55 per share on March 25, 2024. The price per share of Compass Minerals stock continued to fall $0.86 the following trading day, from closing at a price of $14.55 per share on March 25, 2024, to close at a price of $13.69 per share on March 26, 2024.

11. In light of the Individual Defendants' misconduct—which has subjected the Company and various of its former and current officers and directors to a putative federal securities class action lawsuit filed against the Company and Defendants Crutchfield, Dowling, Crenshaw, Hood, and Standen in the United States District Court for the District of Kansas, captioned *Valentine v. Compass Minerals International, Inc. et al.*, case no. 2:24-CV-02165 (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12. Moreover, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping personal profits of approximately $609,421.

13. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, the Company's directors' receipt of material benefits due to the Amended Incentive Plan, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the

"Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

16. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Compass Minerals is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiffs

18. Plaintiffs are current shareholders of Compass Minerals. Plaintiffs have continuously held shares of Compass Minerals common stock at all relevant times.

### Nominal Defendant Compass Minerals

19. Compass Minerals is a Delaware corporation with principal executive offices at 9900 W. 109TH Street, Suite 100, Overland Park, Kansas, 66210. Compass Minerals common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CMP."

**Defendant Crutchfield**

20. Defendant Crutchfield served as the Company's President, CEO, and as a Company director from May 2019 until January 2024. According to the proxy statement that the Company filed with the SEC on January 29, 2024 (the "2024 Proxy Statement"), as of January 19, 2024, Defendant Crutchfield beneficially owned 398,049 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 19, 2024 was $21.16, Defendant Crutchfield owned approximately $8.4 million worth of Compass Minerals stock as of that date.

21. For the 2023 Fiscal Year, Defendant Crutchfield received $9,173,738 in total compensation from the Company. This included $1,124,000 in salary, $5,997,970 in stock awards, $1,921,113 in non-equity incentive plan compensation, and $130,655 in all other compensation. For the 2024 Fiscal Year, Defendant Crutchfield received $10,423,984 in total compensation from the Company. This included $281,000 in salary, $3,934,025 in stock awards, and $6,208,959 in all other compensation.

22. During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Crutchfield made the following sale of Company Common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 13, 2023 | 10,465 | $47.01 | $491,960 |

Thus, in total, before the fraud was exposed, Defendant Crutchfield sold 10,465 shares of Company stock on inside information, for which he received approximately $491,960 in total proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

23. The proxy statement that the Company filed on Form 14A with the SEC on January 3, 2023 (the "2023 Proxy Statement") stated the following about Defendant Crutchfield, in relevant part:

> **PROFESSIONAL BACKGROUND**
> - Joined Compass Minerals in 2019 as President and Chief Executive Officer.
> - Served as CEO and member of the board of directors of Alpha Metallurgical Resources, Inc. (f/k/a Contura Energy, Inc.), a publicly traded, leading coal supplier, from the company's inception in 2016 to 2019.
> - Served as chairman (from 2012 to 2016) and CEO (from 2009 to 2016) of Alpha Natural Resources, Inc., a coal producer.
> - Held roles of increasing responsibility at Alpha Natural Resources from 2003-2009.
> - Spent over 15 years working at El Paso Corporation, a natural gas and energy provider, as well as other coal and gas producers.
>
> * * *
>
> **QUALIFICATIONS**
>
> **Mr. Crutchfield has more than 30 years of mining experience. During that time, he has developed:**
>
> (i) extensive operating and managerial experience in domestic and international businesses;
> (ii) inclusive leadership and communication skills;
> (iii) commodity risk management expertise;
> (iv) extensive experience in advancing growth strategies, including acquisitions and strategic alliances; and
> (iv) broad experience in corporate governance.
>
> Mr. Crutchfield's leadership and strong strategic focus continue to provide our Board with the insight necessary to plan for the Company's long-term success. He also provides valuable insight into our operations, management and culture, serving

as an essential link between management and the Board on management's perspectives.

**Defendant Dowling**

24. Defendant Dowling has served as a Company director since March 2022 and has served as the Company's President and CEO since January 2024. He also serves as a member of the Environmental, Health, Safety and Sustainability Committee. According to the proxy statement which the Company filed on Form 14A on January 23, 2025 (the "2025 Proxy Statement"), as of January 6, 2025, Defendant Dowling beneficially owned 34,285 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 6, 2025 was $11.29, Defendant Dowling owned approximately $387,078 worth of Compass Minerals stock as of that date.

25. For the 2023 Fiscal Year, Defendant Dowling received $232,618 in total compensation from the Company. This included $13,125 in fees earned or paid in cash and $219,493 in stock awards. For the 2024 Fiscal Year, Defendant Dowling received $5,845,645 in total compensation from the Company. This included $705,128 in salary, $350,000 in bonuses, $3,535,579 in stock awards, $888,158 in stock awards under the non-equity incentive plan, and $366,779 in other compensation.

26. The 2025 Proxy Statement stated the following about Defendant Dowling, in relevant part:

**PROFESSIONAL BACKGROUND**

- Became President and Chief Executive Officer of Compass Minerals in January 2024.
- Has over 30 years of mining experience, including as President and CEO of Alacer Gold Corp., a gold producer, from 2008 to 2012, and Chairman from 2013 to 2020. Previously, was President and CEO of Meridian Gold Inc., a gold and silver producer, from 2006 to 2007.

- Served as Executive Director for Mining and Exploration at De Beers S.A., a diamond producer, from 2004 to 2006.
- Served as Executive Vice President for Operations at Cleveland-Cliffs, Inc., an iron miner and steelmaker, from 1998 to 2004.
- Previously served as chairman of the boards of Polyus Open Joint Stock Company and Copper Mountain Mining.

* * *

**QUALIFICATIONS**

**Mr. Dowling has:**

(i) extensive experience in the mining industry;
(ii) substantial leadership and operational experience in complex, international businesses, which includes leadership positions based in multiple countries;
(iii) extensive experience in advancing growth strategies, including mergers, divestitures and acquisitions;
(iv) a strong background in human resources and talent development as well as compensation practices; and
(v) recognized leadership in driving safety, environmental and sustainability improvements.

Mr. Dowling's leadership and strong strategic focus provide our Board with the insight necessary to strategically plan for the Company's long-term success. He also provides valuable insight into our operations, management and culture, providing an essential link between management and the Board on management's perspectives.

**Defendant Crenshaw**

27. Defendant Crenshaw served as the Company's Chief Financial Officer ("CFO") from December 2021 until June 7, 2024, at which point he was terminated without cause.

28. For the 2023 Fiscal Year, Defendant Crenshaw received $2,684,768 in total compensation from the Company. This included $553,177 in salary, $75,000 in bonuses, $1,557,141 in stock awards, $418,723 in non-equity incentive plan compensation, and $80,727 in all other compensation. For the 2024 Fiscal Year, Defendant Crenshaw received $3,266,639 in total compensation from the Company. This included $405,723 in salary, $1,335,194 in stock awards, and $1,525,723 in all other compensation.

29. During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Crenshaw made the following sales of Company Common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| October 15, 2023 | 1,059 | $27.27 | $28,879 |
| December 1, 2023 | 1,578 | $25.32 | $39,955 |

Thus, in total, before the fraud was exposed, Defendant Crenshaw sold 2,637 shares of Company stock on inside information, for which he received approximately $68,834 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

30. The annual report that the Company filed with the SEC on Form 10-K for the 2023 Fiscal Year on November 29, 2023 (the "2023 10-K") stated the following about Defendant Crenshaw:

> **Lorin Crenshaw, Chief Financial Officer**, joined Compass Minerals and assumed his current position in December 2021. Prior to joining Compass Minerals, Mr. Crenshaw served as Chief Financial Officer at Orion Engineered Carbons S.A., a global supplier of specialty and high-performance carbon black, from 2019 to 2021. From 2016 to 2019, Mr. Crenshaw served as the Chief Financial Officer of the global lithium business of Albemarle Corporation, a specialty chemicals manufacturing company. Prior to that role, he held positions of increasing responsibility at Albemarle, including as Treasurer and Head of Investor Relations from 2009 to 2016. His experience also includes over 10 years as an equity and debt investor, respectively, at Citigroup Asset Management and PGIM Private Capital, formerly Prudential Capital Group.

**<u>Defendant Hood</u>**

31. Defendant Hood has served as the Company's Chief Supply Chain Officer since January 2024. Previously, she served as the Company's Vice President of Supply Chain from

September 2019 until August 2023 and as Head of Fire Retardants from August 2023 until January 2024. According to the 2025 Proxy Statement, Defendant Hood beneficially owned 3,165 shares of the Company's common stock as of January 6, 2025. Given that the price per share of the Company's common stock at the close of trading on January 6, 2025 was $11.29, Defendant Hood owned approximately $35,733 worth of Compass Minerals stock as of that date.

32. For the 2024 Fiscal Year, Defendant Hood received $591,693 in total compensation from the Company. This included $341,244 in salary, $78,510 in stock awards, $142,511 under the non-equity incentive plan, and $29,428 in other compensation.

**Defendant Chisholm**

33. Defendant Chisholm served as a Company director from November 2022 until March 5, 2024.

34. The 2023 Proxy Statement stated the following about Defendant Chisholm, in relevant part:

> **PROFESSIONAL BACKGROUND**
>
> • Managing Director of Koch Disruptive Technologies, a subsidiary of Koch Industries, Inc., since 2022.
> • Served as Vice President of Koch Minerals and Trading, LLC from 2014 to 2022.
> • Joined Koch in 2005 and has held several roles of growing responsibility across various Koch subsidiaries, including Flint Hills Resources, Koch Fertilizer and Koch Carbon.
>
> **QUALIFICATIONS**
>
> **Mr. Chisholm has:**
>
> (i) strong financial, investment and commercial capability;
> (ii) expertise in a wide range of industries, including energy, plant nutrition and commodities;
> (iii) leadership experience in complex businesses;
> (iv) substantial experience in strategic planning and mergers and acquisitions.

Mr. Chisholm's leadership experience, expertise in mergers and acquisitions and industry knowledge make him a valuable member of our Board.

**Defendant Gardiner**

35. Defendant Gardiner served as a Company director from May 2023 until March 5, 2024. She also served as a member of the Audit Committee and as a member of the Environmental, Health, Safety and Sustainability Committee. According to the 2024 Proxy Statement, as of January 19, 2024, Defendant Gardiner beneficially owned 4,953 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 19, 2024 was $21.16, Defendant Gardiner owned approximately $104,805 worth of Compass Minerals stock as of that date.

36. For the 2023 Fiscal Year, Defendant Gardiner received $136,619 in total compensation from the Company, consisting entirely of $136,619 in stock awards.

**Defendant Dealy**

37. Defendant Dealy has served as a Company director since May 2022. He also serves as a member of the Audit Committee and as the Chair of the Compensation Committee. According to the 2025 Proxy Statement, as of January 6, 2025, Defendant Dealy beneficially owned 19,165 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 6, 2025 was $11.29, Defendant Dealy owned approximately $216,373 worth of Compass Minerals stock as of that date.

38. For the 2023 Fiscal Year, Defendant Dealy received $224,484 in total compensation from the Company. This included $25,625 in fees earned or paid in cash and $198,859 in stock awards. For the 2024 Fiscal Year, Defendant Dealy received $232,827 in total compensation from the Company in the form of stock awards.

39. The 2024 Proxy Statement stated the following about Defendant Dealy, in relevant part:

> **PROFESSIONAL BACKGROUND**
>
> • Vice President – Permian Basin of ExxonMobil, an oil and gas corporation, since May 2024.
> • Served as Chief Executive Officer of Pioneer Natural Resources from January 2024 through May 2024, President and Chief Operating Officer from 2020 through 2023, Executive Vice President and Chief Financial Officer from 2004 through 2020, Vice President and Chief Accounting Officer from 1998 to 2004, and Vice President and Controller from 1997 to 1998.
> • Joined Parker & Parsley, a predecessor of Pioneer Natural Resources, in 1992 and was promoted to Vice President and Controller in 1996.
> • Mr. Dealy is a Certified Public Accountant and was employed by KPMG LLP before joining Parker & Parsley.
>
> * * *
>
> **QUALIFICATIONS**
>
> **Mr. Dealy has:**
>
> (i) extensive operating and managerial experience in complex businesses;
> (ii) proven financial expertise and knowledge of financial costs and systems;
> (iii) a strong background in strategy and mergers, acquisitions and divestitures; and
> (iv) experience in setting and communicating ESG strategy.
>
> Mr. Dealy's operating and managerial acumen, financial experience, expertise in mergers and acquisitions and knowledge of ESG strategy make him a valuable member of our Board.

**<u>Defendant Joyce</u>**

40. Defendant Joyce has served as a Company director since October 2021. He also serves as Chair of the Environmental, Health, Safety and Sustainability Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2025 Proxy Statement, as of January 6, 2025, Defendant Joyce beneficially owned 19,345 shares of the Company's common stock. Given that the price per share of the Company's common stock at the

close of trading on January 6, 2025 was $11.29, Defendant Joyce owned approximately $218,405 worth of Compass Minerals stock as of that date.

41. For the 2023 Fiscal Year, Defendant Joyce received $220,061 in total compensation from the Company. This included $23,750 in fees earned or paid in cash and $196,311 in stock awards. For the 2023 Fiscal Year, Defendant Joyce received $230,057 in total compensation from the Company in the form of stock awards.

42. The 2025 Proxy Statement stated the following about Defendant Joyce:

**PROFESSIONAL BACKGROUND**

- Chief Executive Officer of Wahoo Fitness, a fitness technology company.
- Served as Chief Executive Officer of Proterra Inc. from 2021 through March 2024, President during 2021 and as President, Proterra Powered and Energy, from 2020 to 2021.
- Served at Delta Airlines Inc., an international airline, as Chief Sustainability Officer in 2020; Senior Vice President, Airport Customer Service, and President, Delta Cargo, from 2017 to 2020; and President, Delta Cargo, from 2016 to 2017.
- From 2004 to 2016, held roles of increasing responsibility at Daimler AG, an international automobile manufacturer, including as President and Chief Executive Officer, Mercedes-Benz Canada, and Vice President, Customer Service, Mercedes-Benz USA.

* * *

**QUALIFICATIONS**

**Mr. Joyce has:**

(i) substantial leadership and operational experience in complex, international businesses, which includes leadership positions based in multiple countries;
(ii) proven expertise in sustainability; and
(iii) experience in strategic planning, customer service, sales and general management.

Mr. Joyce's extensive experience in the transportation sector and focus on electric vehicle battery technology and markets make him a valuable member of our Board. He also provides our Board expertise in sustainability.

**<u>Defendant Miller</u>**

43. Defendant Miller has served as a Company director since July 2022. She also serves as a member of the Environmental, Health, Safety and Sustainability Committee and as Chair of the Nominating and Corporate Governance Committee. According to the 2025 Proxy Statement, as of January 6, 2025, Defendant Miller beneficially owned 16,853 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 6, 2025 was $11.29, Defendant Miller owned approximately $190,270 worth of Compass Minerals stock as of that date.

44. For the 2023 Fiscal Year, Defendant Miller received $221,652 in total compensation from the Company. This included $23,750 in fees earned or paid in cash and $197,902 in stock awards. For the 2024 Fiscal Year, Defendant Miller received $232,524 in total compensation from the Company in stock awards.

45. The 2025 Proxy Statement stated the following about Defendant Miller, in relevant part:

> **PROFESSIONAL BACKGROUND**
>
> - Executive Vice President and Chief Human Resources Officer of Arconic Corporation, which specializes in lightweight metals engineering and manufacturing, since it separated from Arconic, Inc. in 2020.
> - Previously was Vice President of Human Resources for Arconic, Inc.'s Global Rolled Products businesses from 2017 to 2020 and of its Transportation and Construction Systems businesses from 2016 to 2017.
> - Held multiple leadership roles with a broad spectrum of progressive HR responsibilities at Arconic's predecessor, Alcoa, from 2005 to 2016, including as Director, Global Human Resources, Building and Construction Systems from 2011 to 2016.
> - Prior to joining Alcoa, Ms. Miller worked in several HR-related roles at Marconi (formally known as FORE systems) for more than seven years.
>
> * * *
>
> **QUALIFICATIONS**
>
> **Ms. Miller has:**

(i) comprehensive management experience in large, publicly traded international companies;
(ii) a strong background in human resources and talent development as well as compensation practices;
(iii) experience in the development and execution of a human resources strategy; and
(iv) substantial diversity and inclusion leadership skills.

Ms. Miller's extensive management experience and distinctive knowledge of compensation and corporate benefits provide value to our Board.

**Defendant Reece**

46. Defendant Reece has served as a Company director since March 2019. He also serves as the Non-Executive Chairman of the Board, and as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. According to the 2025 Proxy Statement, as of January 6, 2025, Defendant Reece beneficially owned 54,824 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 6, 2025 was $11.29, Defendant Reece owned approximately $618,963 worth of Compass Minerals stock as of that date.

47. For the 2023 Fiscal Year, Defendant Reece received $400,085 in total compensation from the Company, consisting entirely of $400,085 in stock awards. For the 2024 Fiscal Year, Defendant Reece received $409,489 in total compensation from the Company, consisting entirely of stock awards.

48. The 2025 Proxy Statement stated the following about Defendant Reece, in relevant part:

**PROFESSIONAL BACKGROUND**

- Managing Member of SilverBox Capital, LLC, an alternative investment manager that he co-founded, and its predecessors since 2015.
- Previously served as Executive Vice Chairman and Head of UBS Securities LLC's Investment Bank for the Americas from 2017 to 2018 and on the board of directors for UBS Securities LLC.

- Served as a consultant to BDT & Company from October 2019 to November 2021.
- Served in roles of increasing responsibility at Credit Suisse from 1997 to 2015, including as Global Head of Equity Capital Markets and Co-Head of Credit Risk.
- Practiced law for ten years, including at the law firm Skadden, Arps, Slate, Meagher & Flom LLP and at the Securities and Exchange Commission (the "SEC").

* * *

**QUALIFICATIONS**

**Mr. Reece has:**

(i) demonstrated executive leadership with global investment banking firms;
(ii) extensive capital markets experience;
(iii) substantial mergers, acquisition and investment experience, including in the mining and natural resources sectors; and
(iv) A strong understanding of corporate governance and securities laws.

Mr. Reece's extensive leadership experience in investment banking combined with his proven expertise in capital markets, strategy and mergers and acquisitions make him a valuable member of our Board and effective leader as Non-Executive Chairman of the Board.

**Defendant Walker**

49. Defendant Walker has served as a Company director since 2015. She also serves as the Chair of the Audit Committee and as a member of the Environmental, Health, Safety and Sustainability Committee. According to the 2025 Proxy Statement, as of January 6, 2025, Defendant Walker beneficially owned 209,764 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 6, 2025 was $11.29, Defendant Walker owned approximately $2,368,236 worth of Compass Minerals stock as of that date.

50. For the 2023 Fiscal Year, Defendant Walker received $238,207 in total compensation from the Company. This included $28,125 in fees earned or paid in cash and

$210,082 in stock awards. For the 2024 Fiscal Year, Defendant Walker received $242,413 in total compensation from the Company entirely in the form of stock awards.

51. The 2025 Proxy Statement stated the following about Defendant Walker, in relevant part:

> **PROFESSIONAL BACKGROUND**
>
> - Served as CFO and SVP of The Valspar Corporation, a global coatings manufacturer, from 2008 to 2013, where she led the Finance, IT and Communications teams.
> - Served as Valspar's VP, Controller and Treasurer from 2004 to 2008, and as VP and Controller from 2001 to 2004.
> - Prior to joining Valspar, worked at Honeywell, Inc., a global conglomerate of commercial and consumer products, for 20 years in roles with progressively increasing responsibility, including as Director of Global Financial Risk Management.
> - Currently serves on the board of directors of Southwire Company, LLC, a private company.
>
> * * *
>
> **QUALIFICATIONS**
>
> **Ms. Walker has:**
>
> (i) extensive experience as a financial executive with broad knowledge of financial controls and systems;
> (ii) strategic planning expertise;
> (iii) a strong background in mergers, acquisitions, divestitures and strategic alliances; and
> (iv) active service as audit committee chair of a public company and a private company.
>
> Ms. Walker's extensive financial leadership experience in global, publicly traded companies, knowledge of financial controls and systems and risk management and understanding of IT infrastructure have made her a valuable member of our Board and Chair of the Audit Committee.

**<u>Defendant Wagnon</u>**

52. Defendant Wagnon has served as a Company director since November 2022.

53. The 2025 Proxy Statement stated the following about Defendant Wagnon, in relevant part:

> **PROFESSIONAL BACKGROUND**
>
> - Vice President of Trading and Terminals for Koch Carbon, LLC, a subsidiary of Koch Industries, Inc., since 2019.
> - Served as General Manager of Koch's Global Sulfur business from 2012 to 2019.
> - Joined Koch in 2004 via its INVISTA subsidiary. Prior to his commercial leadership roles, Mr. Wagnon served in various business development capacities including capital projects, M&A, corporate restructuring, private equity partnerships and tax-equity investments.
>
> * * *
>
> **QUALIFICATIONS**
>
> **Mr. Wagnon has:**
>
> (i) leadership and management experience in complex businesses;
> (ii) expertise in energy and manufacturing, and experience negotiating sales to miners and producers of fertilizers and chemicals; and
> (iii) substantial experience in strategic planning and mergers and acquisitions.
>
> Mr. Wagnon's industry knowledge and leadership and management experience make him a valuable member of our Board.

**<u>Defendant Standen</u>**

54. Defendant Standen served as the Company's CFO from 2017 until December 2021, at which time he transitioned roles, becoming Compass Minerals' Chief Commercial Officer ("CCO"). Defendant Standen served as the Company's CCO until January of 2024.

55. For the 2023 Fiscal Year, Defendant Standen received $2,319,306 in total compensation from the Company. This included $514,583 in salary, $1,372,221 in stock awards, $387,766 in non-equity incentive plan compensation, and $44,736 in all other compensation. For the 2024 Fiscal Year, Defendant Standen received $2,927,080 in total compensation from the Company. This included $153,595 in salary, $1,190,281 in stock awards, and $1,583,204 in all other compensation.

56. During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Standen made the following sales of Company Common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| October 15, 2023 | 1,289 | $27.2 | $35,151 |
| January 13, 2024 | 659 | $20.45 | $13,476 |

Thus, in total, before the fraud was exposed, Defendant Standen sold 1,948 shares of Company stock on inside information, for which he received approximately $48,627 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

57. The 2023 10-K stated the following about Defendant Standen, in relevant part:

> **James D. Standen, Chief Commercial Officer**, joined Compass Minerals in April 2006 and assumed his current position in December 2021. Prior to this position, Mr. Standen served as the Company's Chief Financial Officer beginning August 2017 and as Interim Chief Financial Officer and Treasurer starting in April 2017. He also served as the Company's Vice President, Finance and Treasurer from October 2016 to April 2017, as Treasurer from July 2011 to October 2016 and as Assistant Treasurer from April 2006 to June 2011. Prior to joining the Company, Mr. Standen spent six years at Kansas City Southern in various finance roles after spending two years with the public accounting firm Mayer Hoffman McCann P.C.

**<u>Relevant Non-Parties</u>**

58. This action incorporates information from public documents, including the Amended Class Action Complaint (the "Amended Complaint") in the Securities Class action, which itself incorporates statements from former Company employees who offered their experiences as confidential witnesses. The following are former employees whose statements are referenced throughout this amended consolidated complaint before his court.

***Former Employee 1***

59. Former Employee 1, ("FE-1") served as Fortress's Chief Administrative Officer from May 2019 until May 2023, and as part of that role reported directly to Fortress CEO Burnham. From Compass Minerals' acquisition of Fortress in May 2023 until March 2024, FE-1 served as the Chief Administrative Officer of Compass Minerals. During his time at Fortress, FE-1 was Fortress's first employee and was deeply involved in all facets of Fortress's business and operations.

***Former Employee 2***

60. Former Employee 2 ("FE-2") is the co-founder and former head of finance and Chief Operating Officer of Fortress. FE-2 stayed with Compass Minerals after its acquisition of Fortress until October 2023.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

61. By reason of their positions as officers, directors, and/or fiduciaries of Compass Minerals and because of their ability to control the business and corporate affairs of Compass Minerals, the Individual Defendants owed Compass Minerals and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Compass Minerals in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Compass Minerals and its shareholders so as to benefit all shareholders equally.

62. Each director and officer of the Company owes to Compass Minerals and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

63. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Compass Minerals, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

64. To discharge their duties, the officers and directors of Compass Minerals were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

65. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Compass Minerals, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised Compass Minerals' Board at all relevant times.

66. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this amended consolidated complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

67. To discharge their duties, the officers and directors of Compass Minerals were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Compass Minerals were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Kansas, and the United States, and pursuant to Compass Minerals' own Code of Ethics and Business Conduct (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed about how Compass Minerals conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Compass Minerals and procedures for the reporting of the business

and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Compass Minerals' operations would comply with all applicable laws and Compass Minerals' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, in part, each of the subjects and duties set forth above.

68. Each of the Individual Defendants further owed to Compass Minerals and the shareholders the duty of loyalty requiring that each favor Compass Minerals' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

69. At all times relevant hereto, the Individual Defendants were the agents of each other and of Compass Minerals and were at all times acting within the course and scope of such agency.

70. Because of their advisory, executive, managerial, directorial, and controlling positions with Compass Minerals, each of the Individual Defendants had access to adverse, non-public information about the Company.

71. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Compass Minerals.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

72. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

73. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

74. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Compass Minerals was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

75. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

76. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Compass Minerals and was at all times acting within the course and scope of such agency.

## COMPASS MINERALS' CODE OF ETHICS

77. The Code of Ethics states that the Code of Ethics applies to all employees, officers, and directors of the Company. The Code of Ethics states the following regarding maintaining accurate books and records:

> As a publicly traded company, we have the responsibility to protect the interest of our stockholders. Acting with responsibility and transparency goes hand in hand with our Core Values of Integrity and Value Creation. We create value for our stockholders by maintaining accurate business records and ensuring our financial statements accurately reflect our business, our earnings and our financial condition.

78. Regarding the integrity of the Company's financial statements, the Code of Ethics states the following:

> The integrity of our financial statements is at the center of our integrity as a company. Any actual or perceived irregularities in our financial statements must be reported to the Chief Financial Officer, Corporate Controller, General Counsel, Audit Committee Chair or the Ethics Hotline.
>
> * * *
>
> As a public company, it is critical that all external communications with investment analysts, the media, and investors be consistent and accurate. Public statements on our company's behalf must be made only by the appropriate source within the company.

79. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Ethics, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Ethics.

## COMPASS MINERALS' AUDIT COMMITTEE CHARTER

80. According to the Audit Committee Charter, the main function of the Audit Committee is to assist the Board with its oversight responsibilities pertaining to: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and the independent auditor.

81. The Audit Committee Charter delineates the duties and responsibilities of the committee as follows:

> 1. The Committee may, in its discretion, conduct or authorize investigations into any matters within the scope of its responsibilities and powers. The Committee will have access to all books, records, and employees of the Company.
>
> 2. The Committee will discuss with management and the independent auditor any related-party transactions brought to the Company's attention which could reasonably be expected to have a material impact on the Company's financial statements or on the independence of any members of the Board.
>
> 3. The Committee will discuss with management the Company's overall policies with respect to its risk identification, assessment and management processes.

The Committee will discuss with management the Company's significant financial risk exposures and the actions management has taken to limit, monitor or control such exposures.

4. The Committee will discuss with the Company's General Counsel or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.

5. The Committee will request assurances from the Company's management, the Company's internal auditor and the independent auditor that the Company's foreign subsidiaries and foreign affiliated entities are in conformity with applicable legal requirements, including disclosure of insider and affiliated party transactions.

6. The Committee will periodically review the Company's insurance programs, including those relating to property, general liability and director and officer liability, with the proposed director and officer insurance program to be presented to the full Board for approval.

7. The Committee will review and discuss with the Company's management the Company's procedures for compliance with applicable laws and regulations.

8. The Committee will annually review and approve the general use of swap transactions by the Company and its subsidiaries.

9. The Committee will review and discuss with management, tax policies, accruals, developments, disputes and other related matters.

10. The Committee will sponsor periodic training for the Board on audit, accounting, financial, compliance and related matters.

11. The Committee will, at least annually, evaluate its own performance including its compliance with this Charter, and report the results of such evaluation, including any recommended changes, to the Board.

12. The Committee will, at least annually, review and reassess this Charter and submit any recommended changes for approval by the Board.

82. In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

83. Compass Minerals, headquartered in Overland Park, Kansas, provides essential minerals, such as salt products for roadway deicing, and plant nutrition products to improve the quality and yield of crops. The Company's products have numerous other applications across the consumer, industrial, chemical, and agricultural industries as well, including "next-generation fire retardants [that] help to slow, stop and prevent wildfires through the use of high-performing and environmentally friendly products."

### *The Fire Retardant Market*

84. The USFS has been using fire retardants to fight and control forest fires since the 1960s. Fire retardants are the chemicals visible in the well-known plumes which forest firefighters drop from airplanes to combat uncontrolled blazes. The USFS is, in essence, the entirety of the American fire retardant market, and it is responsible for buying the vast majority of fire retardant. The USFS maintains a list, known as the Qualified Product List, which enumerates all fire retardant products approved for purchase and use on United States federal and state wildlands. In order to gain placement on the Qualified Product List, a candidate retardant product must first pass laboratory evaluation, which leads to the product's conditional qualification. After this, the product

must undergo a field evaluation, and, if it passes, the product is fully qualified and the USFS may at its discretion choose to purchase it for use in fighting wildfires.

85. Because of the foregoing, if the USFS declines to add a fire retardant product to the Qualified Product List, or if it decides to forego purchasing such a product for the purpose of fighting wildfires in the United States, the retardant product effectively has no market.

86. Until 2020, the only fire retardant used by the USFS was one named Phos-Chek, originally developed, trademarked, and marketed by Monsanto.

87. The active ingredient in Phos-Chek is a compound known as ammonium phosphate. When this phosphate-based compound is dropped on land facing imminent fire encroachment, Phos-Check reacts in such a way with the vegetation as to reduce its flammability, thus working to prevent forest fires from spreading, and decreasing the intensity of already active fires.

88. As time has progressed, advances in modern chemistry have produced better thickening agents to make Phos-Check easier to deploy from planes, as well as more advanced, more effective corrosion inhibitors. Additionally, its manufacturers have steadily worked to improve its environmental impacts. This ongoing evolution has enabled Phos-Chek to enjoy market dominance in the fire retardant space. Spun-off by Monsanto in the 1990s, Phos-Check is now marketed and produced by a company called Perimeter Solutions.

***Fortress and Compass Minerals Seek to Displace Phos-Check***

89. Fortress, formed in 2016, had for some time been seeking to disrupt the market dominance Phos-Check had long enjoyed by developing a fire retardant product that was not based upon phosphates. Fortress instead opted to base its retardant on magnesium chloride, the same compound commonly spread to deice roads in the winter. Fortress bet that if it could add sufficient corrosion inhibitors and other materials to the product, it could sufficiently temper the compound's

corrosiveness to deploy it as an effective fire retardant. Tempering the corrosiveness of its chemical base was crucial: if a retardant is corrosive to metals, it damages the aircraft used to deploy it, and raises safety concerns for the firefighters.

90. Fortress began working closely with Compass Minerals in its efforts to develop its magnesium chloride-based fire retardants in May of 2020, making its retardant using magnesium chloride which it harvests from Compass Minerals' solar evaporation site on the Great Salt Lake, located near Ogden, Utah. Compass Minerals, after making an initial $5 million investment in Fortress in 2020, increased its holdings in the company to 45% in November 2021 with an additional $45 million investment.

91. In early May 2023, Compass Minerals completed the purchase of Fortress by purchasing the remaining 55% of Fortress for $226 million in cash and approximately $28 million in contingent consideration in May 2023,[2] calling Fortress "a next-generation fire retardant company dedicated to developing and producing a portfolio of magnesium chloride-based aerial and ground fire retardant products to help combat wildfires." Consequently, by at least late 2021, and continuing on through the Relevant Period, Fortress was a material part of Compass Minerals' business. Indeed, the importance of Fortress to Compass Minerals is emphasized by Compass Minerals' top leadership opting to closely monitor Fortress and tout its prospects to investors during Company earnings calls on numerous occasions.

92. Enjoying the financial backing of the Company, Fortress continued to work towards its goal of creating a magnesium chloride fire retardant that would be effective on fires without corroding the deploying aircraft. The Retardant which Fortress continued to develop came in a

[2] Compass Minerals would later issue a Non Reliance on Previously Issued Financial Report Form 8-K, identifying misstatements regarding the contingent consideration liability of up to $28 million, and said the Company would restate the effected financial statements.

powder (dry concentrate) form called FR-100 as well as a liquid (wet concentrate) form, FR-200, both of which were designed to be deployed by aircraft.

93. Things seemed promising momentarily: in May 2021, Fortress's magnesium chloride-based fire retardant, in both its dry concentrate and liquid forms, became the first non-phosphate fire retardant conditionally added to the Qualified Product List, meaning that Fortress's product had passed USFS laboratory testing. This meant that the next critical milestone was Fortress's fire retardant successfully passing the Field Evaluation. To conduct the Field Evaluation, 200,000 gallons of FR-100 were dropped from an aircraft based out of an airtanker base in Missoula, Montana, in the summer of 2021. The Field Evaluation was designed to assess whether the Retardant functioned acceptably under actual firefighting conditions.

***The Field Evaluation Finds Extensive Corrosion***

94. The Field Evaluation documented a severe problem with the Retardant in a report entitled *Fortress FR-100 Retardant: Documentation of Aviation Safety-Related Concerns when co-mingled with the Phos-Chek L-95* (the "USFS Retardant Report"): the Retardant produced severe corrosion in carrier planes when comingled with Phos-Chek. While the USFS Retardant Report raised concerns about the potential for corrosive damage when the Retardant was used alone, it focused extensively on the documented "accelerated corrosion" found to occur when trace amounts of FR-100 and Pho-Chek comingled in the field. The USFS Retardant Report stated, in relevant part, that:

> A serious concern is the level of corrosion experienced during the OFE-for Fortress FR-100. Unknown and potentially undetectable issues and long-term effects of both the Magnesium Chloride (MgCl2) based FR-100 product alone as well as the accelerated corrosion experienced when FR-100 co-mingles with the ammonium polyphosphate-based PhosChek LC-95, needs to be further explored. . . . The presence of corrosion can result in a significant decrease in thickness of original load bearing material that can lead to loss of structural integrity and potentially catastrophic failure.

95. The laboratory testing, which had consisted of full immersion of samples of stainless steel in batches of the Retardant's solid and liquid forms at high temperature for thirty days, found no corrosion issue. However *severe* corrosion resulted from comingling of the Retardant and Phos-Chek in airtanker retardant tanks in the Field Evaluation. As the USFS Retardant Report made clear, such comingling, which "occurs during the normal course of business as Air tankers load from different bases," is extremely common. Because of this safety concern, the severity of the documented corrosion, and the fact that two "air tanker companies participating in the [Field Evaluation] experienced maintenance-related issues when [the Retardant] and Phos-Chek LC-95 residuals co-mingled inside the retardant tanks," Fortress faced a serious problem in gaining USFS final approval of the Retardant.

96. The USFS Retardant Report explained in great detail the extremely corrosive and destructive nature of the product produced by comingling residual Phos-Chek and the Retardant. This product, a precipitate, was not water soluble, could thus not be rinsed off, and was highly corrosive, stringy, behaving like fiberglass, and very damaging to aircraft. Sections of the USFS Retardant Report showing the problem with the Retardant's precipitate are excerpted below.





Sample of the substance removed from the tank. This substance will be referred to as **"precipitate"** in this report.



The sample to the left is the precipitate scraped out of a dry bay in July 2021. Company maintenance noted that the precipitate was difficult to pull apart, was "very stringy" and exhibited properties similar to fiberglass. Maintenance personnel submerged a sample in water and found that it would not dissolve. The company collected samples and sent them to the NTDP and to Conair for further analysis.

### COMPARISION OF DRY BAY DOOR ACTUATOR COMPONENTS

***NOTE:*** *All of the following components are inspected annually. Therefore, the documentation presented displays the effects of the co-mingled material (precipitate)experienced during the OFE period, 2021.*

Aircraft hauling both Phos-Chek LC-95 and Fortress FR-100 have documented increased maintenance issues during the OFE. Air actuators were jamming up and requiring replacement on a regular basis, due to corrosion. In addition, a "gummy substance" was found to adhere to flow meters rendering them inoperable. The level of corrosion discovered on many of the aircraft components had not been experienced in the past. The documentation below shows the teardown of an actuator that was inoperable (jammed). The pictures in this report are of dry bay actuator components from an air tanker that had carried both Phos-Chek LC-95 and Fortress FR-100 and one that had carried only Phos-Chek LC-95. To ensure that the issues being experienced were related to the exposure of co-mingled product, the company also removed and dis-assembled a random actuator from an aircraft that had only transported Phos-Chek LC-95.









**End cap mount screws.** No corrosion on screws from Tanker A (LC-95); Corrosion on screws from Tanker B (FR-100/LC-95).




**Tanker B (FR-100/LC-95)**: The **end cap guide** (left) with shaft still attached could not be removed by hand. It was stuck in the cylinder and took several blows from a hammer to free the shaft from the guide. Heavy corrosion can be seen around the shaft and guide. The corrosion was so bad on the end cap and seal (right), that it allowed retardant inside the cylinder (right picture, below).










**Comparison of 2 cylinders from 2 different aircraft tanks:** Above Left: Tanker A which transported only







**Comparison of actuator end cap guide:** Above Left: Tanker A which transported only Phos-Chek LC-95--the actuator end cap showing no corrosion; Above Right: from Air tanker B which has transported both Phos--Chek LC-95 and Fortress FR-100 --shows actuator end cap guide with heavy corrosion







The **actuator** from Tanker A (LC-95 only) was easy to disassemble compared to the actuators that came from Tanker B (FR-100/LC-95). As see in the pictures below, there was no corrosion on the treads of the bolts and screws. Removing the same bolts and screws from the Tanker B actuator was difficult and required a hammer to move the allen wrench.







**Comparison of the end mounting cap:** Tanker A (LC-95) – showing Phos-Chek LC-95 presence, but no corrosion. Tanker B (FR-100/LC-95)—exposed to the co-mingled products—showing corrosion

TA

The following documentation displays corrosion evidence to tank components and issues experienced during aircraft cleaning. These are tanks exposed to the FR-100 and LC-95 co-mingled substance.



Area is 2.5' X 1.5' were the Gluvit has been saturated and is dis-bonding- Gluvit is an epoxy surface coating.



An area of approx. 1" x 1" were the Gluvit has been saturated, dis-bonded and has started to form corrosion.



Retardant that is congealing under all three vent valves



Retardant that is crystallizing in the tank system. Crystallization signifies the occurrence of corrosion.





The pictures are from an Air tanker's dry bay area. This material would not rinse off and mechanics had to crawl into the bay area and use scrapers to remove it.





The butterfly valve controls the rate and volume dispensed in conjunction with the tank floats and flow rate meters. It modulates to control the coverage level. The seal around the valve is filled with air. Precipitate can cause the seal to leak and the valves to operate incorrectly leading to incorrect coverage levels.





The flow meter sends data to the tank control computer. Precipitate restricts and stops the movement of the paddle wheel, this sends incorrect data to the computer which then, sends inaccurate information to the butterfly valves. Errors in the valve, or meter lead to faults and missed dispatches.

**Cleaning/Staining aircraft paint** – the pictures below show Phos-Chek LC-95 layered over Fortress FR-100. The vendors described this as being "difficult to clean" and resulting in a chalky substance left on the fuselage paint after being rinsed off with a hose. This chalky substance was able to be removed with a great deal of scrubbing with a brush and water. The chalky substance only seemed to be present when the FR-100 was mixed with other retardants. LC-95 requires only washing with water or very light scrubbing. On a clean plane with only FR-100, washing with water cleaned off the retardant and did not leave the chalky substance. However, some aircraft experienced permanent staining from FR-100 on some of the landing gear components. Washing with soap, water, and scrub brush would not remove the stains.









Aft Hopper Cross Brace and float:



Level Float Housing

The build-up of the FR-100/LC-95 residue inside of the tanks, would cause the quantity indication system (a series of 7 floats inside the tank) to stick and provide inaccurate indications on the flight deck and loading ports as well as the computer that controls the tank. The thickened substance (precipitate) also caused the flow meters to stick and cause faults which affect the ability to apply a given coverage level.





Crystallizing and congealing of the precipitate in the floats. While the system is designed to account for a few floats and flow meters to be inoperable or out of parameters, the system will indicate a ***Super Fault*** when too many of them are inoperable. A Super Fault means that the drop system will not function properly, and the desired coverage level will not be met. It is noted that the FR-100, alone, did not produce the precipitate---this only occurred when FR-100/LC-95 co-mingle.





Tank Walls and floor: The primary issues the Air tanker vendors experienced with the FR-100/LC-95 co-mingling is the build-up of residue inside of the tanks, and its adhering to tank components.







**End cap guide bolts.** No corrosion on Tanker A bolts (LC-95); Heavy corrosion on threads from Tanker B (FR-100/LC-95).



**Maintenance report FR-100/LC-95 exposure:** The actuator shaft was frozen and required a hammer to remove. Once company Maintenance was able to unfreeze the shaft and pull it to full extension, retardant was present on the shaft.

97. The USFS Retardant Report states that, in addition to the documented corrosion, there existed "concern among the company maintenance personnel" that "there [we]re likely hidden damages that are not being detected. They [were] concerned that if the actuators [were] showing this level of corrosion after hauling only a few loads of FR-100, there [were] likely unseen corrosion issues to other parts inside the retardant tank or fuselage." This was especially concerning, given that such corrosive damage could impair safety, which especially "becomes important if systems malfunction. For example, if an air tanker loses an engine and isn't able to release a load because the drop system is disabled, the outcome would be catastrophic."

98. The USFS Retardant Report concluded, in part, that the Retardant "is an approved product for use, however, due to the lack of data and lack of testing of the substance created when [the Retardant and Phos-Chek] intermingle, it is imperative that these two products *do not come in contact with one another*" (emphasis in original). The USFS Retardant Report continued, recommending "further analysis of the precipitate to determine why is it creating a gummy material that is difficult to clean and determine viable solutions to mitigate issues," as well as "further analysis of the accelerated corrosion that seems to be related to the co-mingling of Fortress FR-100 and Phoschek LC-95." Most importantly, the USFS Retardant Report included the recommendation "**Do not allow** Fortress FR-100 and Pho-Chek LC-95 to come in contact/co-mingle in aircraft retardant tanks" (emphasis in original).

***The Obfuscation Begins as Testing Continues***

99. Fire Aviation Magazine ran an article in April of 2022 entitled *A new competitor encounters obstacles as they attempt to enter the fire retardant market.* This article examined the USFS Retardant Report and its documentation of the severe corrosion caused by comingling Phos-Chek and the Retardant. With respect to the Retardant's Field Examination, the article, in addition

to copying and pasting images and excerpts from the USFS Retardant Report, stated, in relevant part:

> During the 200,000-gallon test of Fortress retardant in 2021 at the Missoula air tanker base a surprising issue was identified by two air tanker companies when their aircraft were loaded with Fortress retardant after carrying Perimeter retardant, or vice versa. In some cases the residuals of the previous retardant when co-mingled with the second product left a sticky substance in the tanks that was visible on interior and exterior surfaces after the tanks were emptied. They also identified increased corrosion on some aircraft components. The co-mingled product was found to present maintenance challenges related to corrosion, parts replacement, and aircraft cleaning according to a report prepared by a group of five aviation specialists who presumably all worked for the Forest Service.

100. The article also included interviews conducted by its author with representatives, including the CEOs, of both Perimeter Solutions and Fortress. A representative of Perimeter Solutions poignantly highlighted the gravity of the problem the Retardant's corrosion posed by juxtaposing USFS Qualified Product List inclusion with the approval process for firefighting foam employed by the Department of Defense. In relevant part, that Perimeter Solutions representative stated that:

> In the Department of Defense qualification process, there is a requirement that any new product being tested must be compatible with any products that are already qualified. They actually test mixtures of any new product with all of the products that are already approved. And that specification has been around for decades.

101. In stark contrast to this, the Fortress executives did not acknowledge the severe corrosion caused by comingling the Retardant with Phos-Chek, despite having seen the USFS Retardant Report and knowing said report was the reason they were being interviewed. Asked about the corrosion problem, a Fortress representative instead referred to lab testing, which, crucially, ***does not involve comingling retardant products***. The representative stated, in relevant part:

> They single out mag chloride and they start talking about it as if we send it up in airplanes in the raw, it's like, 'Hey, we're gonna put raw salt up there.'… Chloride

> would be very corrosive. The science of what we do, what we spend our money on, what Joe [McLellan PhD] has an entire team doing all day is figure out how to neutralize corrosion. That's what [Perimeter] does as well, but not as well as we do. Look at our corrosion numbers.

102. The Fortress executive team took this deflective approach a step further, showing the author a sample of the metal that had been tested in a laboratory:

> Dr. McLellan leads Fortress' work to mitigate the corrosion caused by the retardant, for example adding corrosion inhibitors to the product. During our meeting in a breakout room at the conference he explained a little about how that is done and the tests the Forest Service and the company conduct to detect and measure corrosion. He then went to his backpack and pulled out handfuls of small plastic bags all containing "coupons" of metal strips — 2024-T3 Aluminum to be precise — saying they ran the same exact tests the Forest Service requires for retardants to be on the QPL. He removed the coupons from the bags and carefully laid them out on the black tablecloth, each approximately an inch or so wide and about four inches long. They were labeled for the type of retardant, Fortress's FR-100 or Perimeter's LC95A-Fx. Some were tested with ready to use (RTU) retardant mixed and appropriate for loading onto an air tanker, and others for the concentrate (Conc.) that would need to be mixed with water before being used in an aircraft.
>
> The coupons had been tested by immersion into the retardant for various lengths of time and at different temperatures.
>
> Dr. McLellan held up a couple of the coupons labeled LC95A-Fx that had far more discoloration and pitting than the coupons labeled FR-100, and said, "It's far more corrosive than our product."

103. In short, Fortress attempted to deflect concerns over the corrosion problem by portraying those concerns as a nervous competitor's attempt to derail Fortress's progress. Fortress did so while being fully aware of the corrosion problem documented in the USFS Retardant Report, which Fortress and Compass Minerals had received in or before February of 2022.

104. In summer 2022, the USFS continued the Field Evaluation of Fortress's retardant products, dropping 200,000 gallons of the liquid form of the Retardant from an airtanker base near Ronan, Montana. During this test, the USFS ensured the Retardant and Phos-Chek did not

comingle, thus preventing the corrosion issue from surfacing, and leading to both the liquid and solid forms of the Retardant gaining admission to the Qualified Product List in December 2022.

105. Fortress announced the full qualification of the Retardant on December 12, 2022 via a press release. In this press release, Fortress touted its performance in the USFS's lab testing, providing a link to the lab results and stating that "Fortress LTRs have best-in-class corrosion protection, based on USFS testing. Corrosion testing on aerospace aluminum alloys, steel, and brass consistently demonstrates that Fortress' newly approved LTRs have the lowest corrosion rates of any QPL approved products." Defendant Crutchfield stated that "Compass has been working closely with the Fortress since 2020 and continues to support Fortress's efforts to fully commercialize their Long-Term Fire Retardants products in the USA and internationally." However, to become a truly viable product, the Retardant still had to pass the Integrated Evaluation.

106. On March 9, 2023, the USFS noted in its procurement management system that it intended to amend its existing Fortress contract so as to procure additional Retardant for the purpose of performing the Integrated Evaluation. On April 27, 2023, three officials in the United States Department of Agriculture ("USDA"), which houses the USFS, approved this contract amendment. The Contracting Officer noted in a record dated April 27, 2023, that:

> Fortress's recent approval to the QPL for aerial LTFR for Wildland Fire Management and the USDA FS Specification 5100-304d (or latest version) as amended, ***has created operational concerns of co-mingling of the Fortress aerial LTFR products and existing products in the USDA FS system. Because of the known interaction issues with the aerial LTFR products in the system, it is critical to award a contract for the continued use and testing of the new aerial LTFR products until such time that operational concerns have been fully vetted and the USDA FS can safely and effectively introduce the various aerial LTFR products into the field through formal mitigation measures.***
>
> …
>
> The USDA FS intends to enter into a contract with Fortress to purchase various aerial LTFR products approved on the QPL and the necessary supporting ancillary

services to deliver, mix and load the product onto the designated aircraft. The period of performance will be 90 days from date of award, with an option to extend an additional 90 days if needed. The estimated value of the contract action is approximately $24M. ***To ensure appropriate co-mingling tests are performed on Fortress aerial LTFR products in the field, only one source of supply is available to meet the requirements of the USDA FS.***

…

Ongoing Market Research is being conducted to determine the appropriate tests and test procedures to determine how Fortress's aerial LTFR products can be safely and effectively introduced into the USDA FS system. ***Successful integration of Fortress products will result in future competition in the aerial LTFR products market.***[3]

107. On May 8, 2023, Fortress and the USFS signed the amendment.

***The Integrated Evaluation***

108. The Integrated Evaluation began on June 15, 2023, and ran until December 31, 2023. The Integrated Evaluation sought to examine the serious corrosion problems resulting from comingling Phos-Chek and the Retardant observed in the 2021 Field Evaluation. The Integrated Evaluation involved two airtankers carrying Fortress products in Arizona, California, Montana, and Washington over the summer of 2023. The Integrated Evaluation consisted primarily of strategically locating Fortress mobile retardant bases alongside extant airtanker bases stocked with Phos-Chek and was to proceed in three phases so as to examine and isolate the interaction between the Retardant and various types of Phos-Chek retardant. The Integrated Evaluation also included winter inspections of the participating airtankers for corrosive damage.

109. Phase One began June 15, 2023 at the Fort Huachuca Airtanker Base in Arizona. It consisted of the Integrated Evaluation tankers carrying and dropping only the Retardant's liquid form and reloading only at a Fortress mobile retardant base.

[3] All emphasis herein is added unless otherwise stated.

110. Phase Two began later in the summer, with the Integrated Evaluation airtankers reloading at the closest airtanker base and involved comingling the Retardant's liquid form with all varieties of Phos-Chek, except its LC-95 variant.

111. Phase Three involved more extensive comingling of the Retardant's liquid form and all varieties of Phos-Chek, this time *including* its LC-95 variant.

112. Only after the completion of the Integrated Evaluation and analysis of the results produced thereby would the USFS be able to determine whether the Retardant could proceed to full open competition with Phos-Chek. FE-2 recalled that the USFS insisted on conducting the first phase of the Integrated Evaluation in the summer of 2023 because it had concerns that the "two products didn't mix well."

113. Despite the foregoing, the Individual Defendants neglected to inform investors of the Integrated Evaluation. Instead, the Individual Defendants opted to falsely and misleadingly imply that the Retardant had already passed all requisite USFS testing and bragged about the Integrated Evaluation as a landmark achievement. No mention was made, or indication given that these activities were part of an evaluative test that would determine the Retardant's viability.

114. Throughout the Relevant Period, in breach of their fiduciary duties owed to Compass Minerals, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, in part, that: (1) testing of the Retardant had failed to establish it as a viable product, as its corrosive nature had not been successfully mitigated; (2) a successful pending Integrated Evaluation of its product was required to secure the Retardant's viability; (3) the USFS purchase for the 2023 fire season was not a commercial accomplishment by Compass Minerals, but a purchase made to conduct the Integrated Evaluation; (4) as a result of the foregoing, the Individual Defendants overstated the

prospects of the USFS awarding Compass Minerals a renewed contract for using the Retardant for the 2024 fire season; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Amended Incentive Plan; and (6) in light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**False and Misleading Statements**

***First Quarter 2023 Earnings Call***

115. On February 8, 2023, the Company held its first quarter earnings call with investors and analysts for the 2023 Fiscal Year (the "Q1 2023 Earnings Call"). During the Q1 2023 Earnings Call, Defendant Standen was specifically asked about the comingling issue in the following exchange:

> Vincent Anderson [Stifel]: And then if we're thinking about Fortress, now that we are getting a bit closer to revenues here or, well, earnings. Can you just talk about the relevance of the tankers that are used in fire suppression, what kind of influence they could have on the adoption of your product if they had concerns or consternations over change over time between your product and Perimeter's products or mixing trace amounts of one product with the other? Is there just kind of a gray area in the whole process, I was hoping you could speak to their influence?
>
> ***Defendant Standen***: So comingling is what you're referring to when you perhaps have an aircraft that's going from one base to another and would be using our product after having used Perimeter's product. ***There are standard protocols around how to rinse the tank, how to prevent any issues. I'd first like to mention the Fortress products have passed with flying colors, any corrosion testing. So that's a non-issue. When you have some comingling, you end up with some residue in a tank. So it's simply a rinse process and a reload. So we don't view it as an issue. We think it's very, very manageable by base operations for tankers coming into competitor bases and competitor tankers coming into Fortress bases. So very manageable. And we're on the QPL and we've passed all the tests, so it should not be an issue.***

***May 9, 2023 Press Release***

116. On May 9, 2023, the Company issued a press release stating that it was buying the remaining 55% of Fortress and leaving the Fortress management team in place to run its business. This press release also touted the new Fortress-USFS contract, stating in relevant part:

> In December 2022, Fortress became the first new company in over two decades to have long-term aerial fire retardants added to the U.S. Forest Service's (USFS) Qualified Product List (QPL). ***Fortress' FR-100 Powder and FR-200 Liquid Concentrate products met and exceeded the USFS' rigorous testing criteria in such categories as environmental effects and toxicity to aquatic and mammalian species, corrosion on a variety of aircraft metals, burn retardation efficacy and other qualifiers*** (e.g., long-term storability, acceptable viscosity and pumpability) and finally the completion of a live wildfire operational field evaluation. ***In May of 2023, Fortress entered into a contract with the USFS whereby Fortress will provide up to five mobile-deployed fire retardant air tanker bases, utilizing Fortress' newly designed, state-of-the-art mixing units. These units are expected to be deployed to air bases where Fortress will supply product and attendant services for the 2023 fire season***.

117. The May 9, 2023 press release also included commentary from Fortress CEO Robert Burnham, stating in relevant part:

> Burnham commented, "Being fully integrated with Compass Minerals will represent a quantum leap forward for Fortress and empower us to scale up and compete in what has been a one-sided market. ***Achieving the recent milestone of becoming the first new company in more than two decades to have our aerial fire retardants fully approved on the Qualified Product List, followed by securing a binding supply agreement with the USFS, represents the culmination of a multiyear effort and shared vision between the Fortress and Compass Minerals teams***.[”]

***May 9, 2023 Second Quarter Earnings Press Release***

118. On May 9, 2023, the Company also issued a press release for the purpose of announcing their second-quarter financial results (the "Q2 2023 Earnings Release"). The Q2 2023 Earnings Release announced as a recent highlight the "[a]qcuisition of remaining 55% of Fortress North America (Fortress), a next-generation fire-retardant company, expected to be immediately accretive in fiscal 2023 with prospects for considerable upside thereafter." The Q2 2023 Earnings Release also included some details related to the contract extension Fortress and the USFS had

signed the day before. This included, in relevant part, and without mentioning the impending Integrated Evaluation:

> Prior to the acquisition, Fortress entered into an agreement with the U.S. Forest Service (USFS) to supply product and provide associated services in the 2023 fire season. Fortress is the first new aerial fire-retardant company in over 20 years ***to supply fully approved retardants to the USFS in its fire-fighting activities***. Fortress is expected to generate between $20 million and $25 million of revenue and operating profit and EBITDA in the low double-digit millions of dollars in fiscal 2023.

***May 10, 2023 Second Quarter 2023 Earnings Call***

119. On May 10, 2023, the following day, the Company held its earnings call for the second quarter of fiscal 2023 (the "Q2 2023 Earnings Call"). In the prepared remarks portion of the Q2 2023 Earnings Call, Defendant Crutchfield stated, in relevant part:

> For those of you who are not familiar with Fortress, it's a next gen fire retardant company that utilizes our magnesium chloride and other salt production as the key ingredients in its formulations of aerial and ground fire retardants. The aerial fire retardant industry has essentially been a monopoly for over two decades. Bob Burnham and his team are entrepreneurs, as well as fire, aviation, chemistry, and government contract experts who saw an opportunity to develop a suite of products that were more effective and better for the environment than the incumbent products being used.
>
> …
>
> In December 2022, Fortress became the first new company in over two decades to have long term aerial, fire retardants added to the U.S. Forest Service, qualified product list, or QPL after meeting or exceeding rigorous testing across a number of categories and evaluations.
>
> . . .
>
> Then early this month, Fortress reached an agreement with the U.S. Forest Service that will result in Fortress supporting up to five mobile deployed air bases with product and associated services in the upcoming 2023 fire season utilizing Fortress new state of the art, mobile and fixed retardant mixing units. The U.S. government recognizes that competition in the market is preferable to sole sourcing for essential products and services and accordingly, there are programs that provide on ramps into the retardant market where it would like to see competition occur.
>
> Under a framework used by U.S. government agencies, including the U.S. Forest Service to boost competition in critical sectors where government is the primary buyer, a substantial portion of Fortress activity will be contracted by the U.S. Forest Service in fiscal '23. We anticipate operating under a similar framework in 2024 as

> well, and then moving into more open competition in 2025. In the simplest terms, this program establishes a glide path for new competitors like Fortress, to attain critical mass for their products and services in the first couple of years of commercial operation and encourages Fortress to build additional scale.

120. During the question-and-answer ("Q&A") portion of the Q2 2023 Earnings Call, the Individual Defendants were asked specifically about whether there would be any "monitoring" with "the competitive product" that would occur in the then-upcoming fire season:

> Vincent Anderson [Stifel]: So will the acres that deploy your product this year, assuming it's required, will those receive some kind of active monitoring to continue to compare and contrast with the competitive product?
>
> **Defendant Standen**: Acres, are you talking, are you still talking about fire retardant?
>
> Vincent Anderson [Stifel]: Still Fortress. Yeah. This was studied.
>
> Speaker: I'm not sure I understand. Can you say it again? Sorry.
>
> Vincent Anderson [Stifel]: You're going to be deployed, this year in the field, officially? And will there be active monitoring of how your product performs?
>
> **Defendant Crutchfield**: ***So the product efficacy is defined, established, and that's actually what gets us on the QPL as well as the environmental benefits, etc. So there is not. This is a process where we are ramping up kind of five mobile retardant bases through the summer to various locations. We're currently working on that operational plan now with the expectation that the first base deploys in June and then ramps up through the season. And it'll be working, the bases will be in similar locations to the incumbent. And able to operate at the same time at the same places throughout the season***.

***August 8, 2023 Third Quarter Business Update Presentation***

121. The Company's *Third-Quarter Business Update Presentation*, dated August 8, 2023, continued to mislead investors as to the nature of the Integrated Evaluation and the purchase of the Retardant associated therewith. Slide ten of the presentation is excerpted below:

Fortress Update

COMPASS MINERALS

COMPASS MINERALS + FORTRESS FIRE RETARDANT SYSTEMS

- Acquired remaining 55% not previously owned of Fortress in May 2023, advancing strategy to accelerate growth and reduce weather dependency by expanding into faster-growing, adjacent markets
- In May 2023, Fortress entered into an agreement with the U.S. Forest Service (USFS) to provide products and services through up to five mobile retardant bases during the 2023 fire season
- Achieved commercial milestone in June 2023 with first commercial drops of product in Arizona
- Subsequent to quarter-end, Fortress had four mobile bases deployed in Arizona, California, Montana and Washington
- USFS recently deployed aircraft out of San Bernardino, California to drop Fortress product on the Rabbit fire in Riverside County



Above: Fortress FR-200 aerial retardant being deployed at the Rabbit fire in Riverside County, California.

10

***August 8, 2023 Third Quarter Earnings Press Release***

122. On August 8, 2023, the Company issued a press release announcing the financial results for the third quarter of the 2023 Fiscal Year (the "Q3 2023 Earnings Release"). The Q3 2023 Earnings Release included a section bearing the heading "Fortress North America Update," which stated, in relevant part:

> As previously disclosed, Compass Minerals completed the acquisition of the remaining 55% of Fortress that it did not own on May 5, 2023. ***Prior to the acquisition, Fortress entered into an agreement with the U.S. Forest Service (USFS) to supply product and provide associated services in the 2023 fire season for up to five mobile bases. In June it achieved a commercial milestone by dropping its first product supporting fire suppression efforts in Arizona. Subsequent to quarter end, the USFS deployed an aircraft out of a base in San Bernardino, California, to drop Fortress products on the Rabbit fire in Riverside County.***

***August 9, 2023 Third Quarter Earnings Call***

123. On August 9, 2023, the Company held an earnings call with investors and analysts for the third quarter of the 2023 Fiscal Year (the "Q3 2023 Earnings Call"). On the Q3 2023

Earnings Call, Defendant Crutchfield bragged about the ongoing Integrated Evaluation as though it were a milestone regular supply contract, stating in relevant part during his prepared remarks:

> Changing gears to our other primary growth opportunity, I'm pleased to be able to share some exciting updates with regard to Fortress. As we announced last quarter, we acquired the outstanding 55% in Fortress in May of this year, bringing our ownership stake to 100%. ***This occurred shortly after they signed a supply agreement with the U.S. Forest Service. Using their advanced mobile units, Fortress is supporting up to five air tanker bases with product and associated services this 2023 fire season. In June, Fortress began dropping product at an Arizona Air Base, marking Fortress' first commercial sales since being added to the Forest Service qualified product list in late '22.*** As expected, the feedback we've received regarding both the performance of the products and the execution by the Fortress team has been extremely positive.
>
> Subject to quarter end, we were working on three additional assigned bases. One in Montana, one in Washington State, and the U.S. Forest Service base in California. ***In fact, the U.S. Forest Service recently deployed an aircraft out of a base in San Bernardino, California, to drop Fortress products on the Rabbit fire in Riverside County marking our first drops in California***. Most recently, Fortress has been active in combating fires in the Mojave Desert.
>
> ***The team at Fortress continues to work on its next generation of products. FR-105 will eventually replace FR-100 as the company's primary powder retardant offering. We expect that it will deliver improvements with regard to visibility, environmental impact. FR-105 is undergoing the continuation of operational field evaluation that began in '22 and today has dropped approximately 65% of the required 200,000 gallons. We're well on our way to completing the required OFE-volume this summer. Looking ahead, we're currently in discussions with U.S. Forest Service regarding the contract for 2024 and beyond.***

124. During the Q&A portion of the Q3 2023 Earnings Release, Defendant Crutchfield was asked what needed to happen for Compass Minerals to scale its Fortress business, given the presence of a well-established major competitor, as excerpted in relevant part below:

> Greg Lewis [BTIG]: Okay. That's great to hear. And then just, as I think about Fortress, it seems like this is just getting, just continuing to be a nice driver for the company. And realizing there's a major existing competitor. I guess the question is, what needs to happen for the company to really scale up this business? And I know as we were talking the last couple months, is there a way to accelerate that scaling up to kind of to take advantage of just really the demand for that?

> **Defendant Crutchfield:** Yeah, we're well on our way in doing that. We are engaging with the U.S. Forest Service for a multi-year agreement 2024 and beyond. Those discussions will really get into details in this month and in September. So I think we're going to have a lot more visibility on what the next few years look like within the next 60 to 90 days. So there's nothing that we can do beyond make, kind of, nailing that arrangement as we go into '24 and '25.

***November 16, 2023 Fourth Quarter and Full Year Business Update Presentation***

125. The Company's *Fourth-Quarter and Full-Year Business Update Presentation*, dated November 16, 2023 continued to mislead investors as to the nature of the Integrated Evaluation and the purchase of the Retardant associated therewith. Slide ten of the presentation is excerpted below:




***November 16, 2023 Fourth Quarter Earnings Press Release***

126. On November 16, 2023, the Company released its earnings report for the fourth quarter of the 2023 Fiscal Year (the "FY 2023 Earnings Release"). The FY 2023 Earnings Release included a section titled "Fire Retardant Business Update," the body beneath which stated, in relevant part:

> During the year, Compass Minerals completed the acquisition of the remaining 55% of Fortress, bringing the company to full ownership. ***Prior to the acquisition, Fortress entered into its initial agreement with the U.S. Forest Service (USFS) to supply product and provide associated services in the 2023 fire season for up to five mobile bases and in June it achieved its first commercial sales. Feedback received regarding the performance of Fortress products and the operational execution by company personnel was positive.***

***November 17, 2023 Fourth Quarter Earnings Call***

127. On November 17, 2023, the Company held its earnings call for the fourth quarter of the 2023 Fiscal Year (the "FY 2023 Earnings Call"). In prepared remarks on the FY 2023 Earnings Call, Defendant Crutchfield stated, in relevant part:

> Fiscal '23 was also an exciting year for our emerging Fire Retardant business. After a rigorous multi-year process, two core Fortress products were added to the US Forest Service qualified product list in December of 2022. ***This opened the door to allow governmental agencies to purchase Fortress' fire retardant products, which were the first new products to enter the market in nearly two decades. Fortress was awarded its first contract in May and we consolidated our ownership of the company shortly thereafter. In June '23, we achieved another milestone when we dropped our first commercial product. The feedback that we've received on the efficacy of the products and the operational performance of the team has been excellent. We're currently in the process of finalizing our contract with US Forest Service for 2024***. We're off to a good start with Fortress and we're excited about the high-margin counter-seasonal growth potential that this business can provide for the Company.

***2024 Proxy Statement***

128. On January 29, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Dowling, Dealy, Joyce, Miller, Reece, Wagnon, Walker, Gardiner, and Chisholm solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

129. The 2024 Proxy Statement called for the Company's shareholders to vote to, in part: (1) re-elect Defendants Dowling, Dealy, Joyce, Miller, Reece, Wagnon, and Walker to the Board; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve, on an advisory basis, the compensation of

the Company's named executive officers; and (4) approve the Amended Incentive Plan to increase the number of common shares available under the 2020 Incentive Award Plan by 3,000,000. As disclosed in the 2024 Proxy Statement, as of January 19, 2024, there were 819,454 shares of common stock remaining which were available to be issued under the 2020 Incentive Award Plan.

130. The 2024 Proxy Statement noted that if the Compass Minerals shareholders approved the Amended Incentive Plan, it would "be sufficient for awards made for at least two years based on historical practices for our core business…" Further, the 2024 Proxy Statement noted that approval of the Amended Incentive Plan will cause "a maximum of 6,727,933 shares of common stock" to be "reserved for issuance under the Amended Plan, of which 6,600,000 may be granted as incentive stock options…"

131. Regarding the Board's "Role in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

**BOARD'S ROLE IN RISK OVERSIGHT**

Our Board's role in our risk management process is one of oversight. The independent structure of our board enables objective oversight of the risk management process.

Board committees are provided with more specific information on our risks and risk mitigation activities relating to their respective area of responsibility.

**AUDIT COMMITTEE**

Oversees:
- our enterprise risk management process, and
- our major financial risk exposures, including cybersecurity risk.

**COMPENSATION COMMITTEE**

Oversees:
- risks related to our compensation policies and practices, and
- talent and human capital management related risks.

**NOMINATING/CORPORATE GOVERNANCE COMMITTEE**

Oversees:
- matters related to our corporate governance risks and Board independence.

**ENVIRONMENTAL, HEALTH, SAFETY AND SUSTAINABILITY COMMITTEE**

Oversees:
- environmental, health, safety and sustainability risks, including climate-related risks, that are inherent in our business, and
- our compliance with EHS&S initiatives.

132. Regarding the Code of Ethics, the 2024 Proxy Statement stated the following, in relevant part:

> We have adopted a Code of Ethics and Business Conduct (our "Code of Ethics") for our directors, officers and employees, which is grounded in our Core Values. Our Code of Ethics is reviewed each year for appropriate updates. Directors, officers and salaried employees are asked to annually certify their understanding of and compliance with our Code of Ethics.
>
> Only our Board or a designated Board committee may grant waivers of our Code of Ethics for our directors and executive officers. We intend to disclose any changes in, or waivers from, our Code of Ethics by posting such information on www.compassminerals.com or by filing a Current Report on Form 8-K, in each case if such disclosure is required by SEC or NYSE rules. No waivers of our Code of Ethics were granted to directors or officers in fiscal 2023.
>
> Our Code of Ethics is made available to our employees in English and Canadian French and is available on our website.

133. Defendants Dowling, Dealy, Joyce, Miller, Reece, Wagnon, Walker, Gardiner, and Chisholm caused the 2024 Proxy Statement to be false and misleading by failing to disclose, in part, that: (1) testing of the Retardant had failed to establish it as a viable product, as its corrosive nature had not been successfully mitigated; (2) a successful pending Integrated Evaluation of its product was required to secure the Retardant's viability; (3) the USFS purchase for the 2023 fire season was not a commercial accomplishment by Compass Minerals, but a purchase made to conduct the Integrated Evaluation; (4) as a result of the foregoing, the Individual Defendants overstated the prospects of the USFS awarding Compass Minerals a renewed contract for using the Retardant for the 2024 fire season; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Amended Incentive Plan; and (6) in light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

134. The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

135. As a result of Defendants Dowling, Dealy, Joyce, Miller, Reece, Wagnon, Walker, Gardiner, and Chisholm causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, in part, to: (1) re-elect Defendants Dowling, Dealy, Joyce, Miller, Reece, Wagnon, and Walker to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve named executive officer compensation on an advisory, non-binding basis; and (4) approve the Amended Incentive Plan.

136. As a result of the shareholders approving the Amended Incentive Plan, there were an additional 3,000,000 shares available for issuance under the 2020 Incentive Plan. The Individual Defendants, including many of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the Amended Incentive Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the Amended Incentive Plan in the future.

***February 8, 2024 Earnings Conference Call***

137. On February 8, 2024, the Company hosted an earnings conference call with analysts and investors to discuss the Company's financial performance for the first quarter of 2024 (the "Q1 2024 Earnings Call"). During the Q1 2024 Earnings Call, Defendant Crenshaw stated the following about Fortress and USFS contracts:

> Regarding Fortress, subsequent to our last earnings call, which occurred in November, the U.S. Forest Service changed the solicitation contract requirements for the calendar '24 contract and this has resulted in delays in the negotiation and finalization of a contract for the '24 fire season, which starts in the April, May timeframe. ***We continue to expect to have a finalized contract prior to deployment for the upcoming fire season.***

138. Also, during the Q1 2024 Earnings Call, an analyst inquired about the reasons for the delay in securing a contract between the Company and the USFS, asking the following question:

> And then lastly, you talked about some changes in requirements from the US Forest Service affecting your Fortress business. But I couldn't tell whether you thought that it actually delayed anything. What you said is you expected to have your paperwork in order before the 2024 fire season. So if that's true, does the delay really make no difference?

139. Defendant Hood responded by stating the following:

> So the delay, just to give a little bit more color on that. The original solicitation from the US Forest Service was issued in late September. It took them until mid December to issue a final revised solicitation, and the solicitation deadline was then January 10th. So it absolutely pushed back the contracting process, in total. ***However, we are pleased since January 10th when we were able to start the negotiations, we're pleased with the progress and the engagement that we're seeing from US Forest Service. Keep in mind that previously the Forest Service was dealing with one sole source supplier for over two decades. So thinking about how to integrate another supplier, both from a contractual standpoint as well as in the field has been quite challenging for them, but however, we are supporting them in those efforts. And again, we're pleased with the engagement that we've received since the submission deadline.***

140. The above statements in ¶¶115-127 and 137-139 were materially false and misleading because they failed to disclose, in part, that: (1) testing of the Retardant had failed to

establish it as a viable product, as its corrosive nature had not been successfully mitigated; (2) a successful pending Integrated Evaluation of its product was required to secure the Retardant's viability; (3) the USFS purchase for the 2023 fire season was not a commercial accomplishment by Compass Minerals, but a purchase made to conduct the Integrated Evaluation; (4) as a result of the foregoing, the Individual Defendants overstated the prospects of the USFS awarding Compass Minerals a renewed contract for using the Retardant for the 2024 fire season; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Amended Incentive Plan; and (6) in light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

141. On March 25, 2024, the truth began to emerge, before market hours, when Compass Minerals issued a press release, titled "Compass Minerals Announces the Company Will Not Secure a USFS Contract to Supply Magnesium Chloride-Based Aerial Fire Retardants for the 2024 Fire Season," that revealed that the Company would not secure a contract with USFS to supply magnesium chloride-based aerial fire retardants for the 2024 fire season. The press release fully revealed:

> Compass Minerals (NYSE: CMP), ***a leading global provider of essential minerals, today announced that the U.S. Forest Service (USFS) has informed the company that it will not be entering into a contract for the use of magnesium chloride-based aerial fire retardants for the 2024 fire season.***
>
> During ***scheduled winter airtanker inspections as part of the USFS' Integrated Operational Field Evaluation (I-OFE), it was discovered that certain airtankers that had flown Fortress North America's (Fortress') proprietary, magnesium chloride-based aerial fire retardants revealed significant signs of corrosion in areas where build-up of the retardant had occurred. The findings from this more extensive inspection raised aircraft safety concerns,*** prompting the USFS' decision to inform Compass Minerals on March 22, 2024, that it would be "unable

> to define the scope and associated terms and conditions of a new contract" with the company until the National Transportation Safety Board (NTSB) and National Institute of Standards and Technology (NIST) conducted a coordinated, independent assessment of the findings.
>
> ***"While we are disappointed with the findings of the initial inspection, we share the USFS' prioritization of safety above all other factors,"*** said Edward C. Dowling Jr., president and CEO. "As we work collaboratively with the USFS, NTSB and NIST on the more detailed assessment to be conducted, we have to assume based on this new information ***that Fortress' proprietary, magnesium chloride-based aerial fire-retardant formulation will not be utilized for the foreseeable future in the fight against wildfires."***

142. A BMO Capital Markets analyst report issued that same day (March 25, 2023) stated that "CMP will not be signing a supply agreement for the 2024 fire season with the USFS after its Fortress branded (magnesium chloride) aerial fire retardant caused corrosion in airtankers." The analyst continued, opining that the "Fortress development [was] shocking, in [their] view."

143. On this news, the price per share of Compass Minerals stock fell $3.00, or 17.09%, from closing at a price of $17.55 per share on March 22, 2024, to close at a price of $14.55 per share on March 25, 2024. The price per share of Compass Minerals stock fell $0.86 the following trading day, from closing at a price of $14.55 per share on March 25, 2024, to close at a price of $13.69 per share on March 26, 2024.

**SUBSEQUENT DEVELOPMENTS**

144. On May 7, 2024, the Company announced a $55.6 million impairment charge to write down goodwill and intangible assets as "a result of the uncertainty surrounding the future use of these magnesium chloride-based products" for aerial firefighting.

**INDIVIDUAL DEFENDANTS' KNOWLEDGE**

145. The Individual Defendants knew or recklessly disregarded that the Retardant needed to undergo the Integrated Evaluation and that no contract with USFS was finalized during the Relevant Period.

146. FE-1 relayed that along with top executives at Fortress *and* Compass Minerals, including Defendants Crutchfield and Standen, as well as Fortress CEO Burnham, FE-1 received copies of the USFS Retardant Report via email shortly after the 2021 fire season, in or before February 2022. FE-1 confessed that the Company knew from the USFS Retardant Report that the comingling of the Retardant and Phos-Chek caused serious corrosion, going as far as to state that top executives, including Defendants Crutchfield and Standen, "were completely aware" of the problem.

147. FE-2 further recalled that the Individual Defendants knew about the comingling issue that was being probed in the Integrated Evaluation. FE-2 stated that, prior to and during the testing, Company executives and the USFS were discussing possible ways to resolve the corrosion problem weekly. FE-2 recalled that:

> We had calls with the Forrest Service every week. We were always talking about solutions. . . . There are a lot of ways to solve it. Just don't comingle them. Never let the two products mix. Put them in different parts of the country. Just use the magnesium chloride fire retardant somewhere [instead of both] because it had a much better eco footprint. They had all kinds of options but they decided to do their [Phase One of the Integrated Evaluation] so that was their edict. We had no choice.

148. FE-1 corroborated this situation, having themselves been party to those weekly calls. FE-1 recalled further that the calls included Defendant Hood, other non-party Compass Minerals executives, and leaders from the USFS based in both Washington, D.C., and Boise, Idaho. FE-1 recalled that during these calls, the attendees would discuss the ongoing Phase One testing: "It was how things were going, what testing was being done, what was being completed, what was the next step." FE-1 took notes during these calls and emailed those notes to Defendant

Hood and others. In sum, leading up to and during the Phase One Integrated Evaluation testing, Compass Minerals had a "very close" working relationship with the USFS, according to FE-1. Furthermore, FE-1 confirmed that Compass Minerals executives, including Defendants Crutchfield, Crenshaw, Standen, and Hood, were aware of the upcoming Phase One Integrated Evaluation several months before its commencement because of the sheer volume of logistical work required to conduct such testing. FE-1 recalled the "ramp up" to it beginning by mid-April 2023.

149. FE-1 *also* recalled that the Company held internal meetings on a weekly-to-bi-weekly basis specifically to address the ongoing Integrated Evaluation and the comingling corrosion problems. Defendants Crutchfield, Crenshaw, and Standen attended said meetings, and thus were aware of and themselves discussed the problem throughout the summer of 2023. FE-1 personally set up the meetings that focused on these issues and was personally responsible for ensuring the attendance of Defendants Crutchfield, Crenshaw, and Standen. They were thus "very well aware of what was going on," according to FE-1.

**DAMAGES TO COMPASS MINERALS**

150. As a direct and proximate result of the Individual Defendants' conduct, Compass Minerals will lose and expend many millions of dollars.

151. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

152. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the

Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

153. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

154. Such losses include the $55.6 million impairment taken in May 2024.

155. As a direct and proximate result of the Individual Defendants' conduct, Compass Minerals has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

156. Plaintiffs bring this action derivatively and for the benefit of Compass Minerals to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Compass Minerals, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, for violations of Section 14(a) of the Exchange Act, and for contribution under Sections 10(b) and 21D of the Exchange Act.

157. Compass Minerals is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

158. Plaintiffs are, and have been at all relevant times, shareholders of Compass Minerals. Plaintiffs will adequately and fairly represent the interests of Compass Minerals in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

159. Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

160. A pre-suit demand on the Board of Compass Minerals is futile and, therefore, excused. At the time of filing of this amended consolidated complaint, the Board consists of the following eight individuals: Defendants Dowling, Dealy, Joyce, Miller, Reece, Wagnon, and Walker (the "Director-Defendants") and non-party Vance O. Holtzman (together with the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to four of the eight Directors that were on the Board at the time of the filing of this amended consolidated complaint.

161. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

162. The Director-Defendants solicited the 2024 Proxy Statement to call for a shareholder vote to, in part, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to Compass Minerals.

163. In addition, the Director-Defendants caused the 2024 Proxy Statement to call for a shareholder vote to approve the Amended Incentive Plan, which increased the amount of shares available under the Incentive Plan by 3,000,000. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the Amended Incentive Plan who would

not have approved the Amended Incentive Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the Amended Incentive Plan at the annual meeting of stockholders of Compass Minerals on March 5, 2024, 819,545 shares remained available for future issuance under the 2020 Incentive Plan. After the shareholders approved the Amended Incentive Plan, there were an additional 3,000,000 shares available for issuance under the Amended Incentive Plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the Amended Incentive Plan that increased the number of shares available under the 2020 Incentive Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

164. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

165. Additional reasons that demand on Defendant Dowling is futile follow. Defendant Dowling has served as a Company director since March 2022 and has served as the Company's President and CEO since January 2024. Defendant Dowling has received and continues to receive compensation for his role as a director and as the Company's highest officer. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and

contributed to the re-election of Defendants Dealy, Joyce, Miller, Reece, Wagnon, and Walker, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the Amended Incentive Plan. As a trusted Company director and as the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. He is also a defendant in the Securities Class Action. Moreover, under the Amended Incentive Plan, Defendant Dowling is eligible to receive stock awards under the Amended Incentive Plan, thereby materially benefiting from the adoption of the Amended Incentive Plan. For these reasons, Defendant Dowling breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166. Additional reasons that demand on Defendant Dealy is futile follow. Defendant Dealy has served as a Company director since May 2022. He also serves as a member of the Audit Committee and as the Chair of the Compensation Committee. Defendant Dealy has received and continues to receive compensation for his role as a director. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Dowling, Joyce, Miller, Reece, Wagnon, and Walker, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the Amended Incentive Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets.

Moreover, under the Amended Incentive Plan, Defendant Dowling is eligible to receive stock awards under the Amended Incentive Plan, thereby materially benefiting from the adoption of the Amended Incentive Plan. For these reasons, Defendant Dealy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167. Additional reasons that demand on Defendant Joyce is futile follow. Defendant Joyce has served as a Company director since October 2021. He also serves as a member of the Environmental, Health, Safety and Sustainability Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Joyce has received and continues to receive compensation for his role as a director. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Dealy, Dowling, Miller, Reece, Wagnon, and Walker, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the Amended Incentive Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, under the Amended Incentive Plan, Defendant Joyce is eligible to receive stock awards under the Amended Incentive Plan, thereby materially benefiting from the adoption of the Amended Incentive Plan. For these reasons, Defendant Joyce breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168. Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since July 2022. She also serves as a member of the

Environmental, Health, Safety and Sustainability Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Miller has received and continues to receive compensation for her role as a director. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Dealy, Dowling, Joyce, Reece, Wagnon, and Walker, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the Amended Incentive Plan. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, under the Amended Incentive Plan, Defendant Miller is eligible to receive stock awards under the Amended Incentive Plan, thereby materially benefiting from the adoption of the Amended Incentive Plan. For these reasons, Defendant Miller breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

169. Additional reasons that demand on Defendant Reece is futile follow. Defendant Reece has served as a Company director since March 2019. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Reece has received and continues to receive compensation for his role as a director. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Dealy, Dowling, Joyce, Miller, Wagnon, and Walker, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the Amended Incentive Plan.

As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, under the Amended Incentive Plan, Defendant Reece is eligible to receive stock awards under the Amended Incentive Plan, thereby materially benefiting from the adoption of the Amended Incentive Plan. For these reasons, Defendant Reece breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170. Additional reasons that demand on Defendant Walker is futile follow. Defendant Walker has served as a Company director since 2015. She also serves as the chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Walker has received and continues to receive compensation for her role as a director as described above. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Dealy, Dowling, Joyce, Miller, Wagnon, Reece, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the Amended Incentive Plan. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, under the Amended Incentive Plan, Defendant Walker is eligible to receive stock awards under the Amended Incentive Plan, thereby materially benefiting from the adoption of the Amended Incentive Plan. For these reasons, Defendant Walker breached

her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

171. Additional reasons that demand on Defendant Wagnon is futile follow. Defendant Wagnon has served as a Company director since November 2022. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Dealy, Dowling, Joyce, Miller, Walker, Reece, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the Amended Incentive Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Additionally, Defendant Wagnon's insider sales, made while the Company's stock prices were artificially inflated because of the false and misleading statements alleged herein, further demonstrate Defendant Wagnon's motive to participate in the scheme. Moreover, under the Amended Incentive Plan, Defendant Wagnon is eligible to receive stock awards under the Amended Incentive Plan, thereby materially benefiting from the adoption of the Amended Incentive Plan. For these reasons, Defendant Wagnon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172. Additional reasons that demand on the Board is futile follow.

173. Defendants Dealy, Reece, and Walker served as members of the Audit Committee during the Relevant Period. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's

compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

174. In violation of the Code of Ethics, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations, and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

175. Compass Minerals has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Compass Minerals any part of the damages Compass Minerals

suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

176. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

177. The acts complained of herein constitute violations of fiduciary duties owed by Compass Minerals' officers and directors, and these acts are incapable of ratification.

178. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Compass Minerals. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, in part, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Compass Minerals, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

179. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Compass Minerals to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

180. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

181. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

182. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

183. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

184. Under the direction and watch of Defendants Dowling, Dealy, Joyce, Miller, Reece, Wagnon, Walker, Gardiner, and Chisholm, the 2024 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

185. The 2024 Proxy Statement also failed to disclose that: (1) testing of the Retardant had failed to establish it as a viable product, as its corrosive nature had not been successfully mitigated; (2) a successful pending Integrated Evaluation of its product was required to secure the Retardant's viability; (3) the USFS purchase for the 2023 fire season was not a commercial accomplishment by Compass Minerals, but a purchase made to conduct the Integrated Evaluation; (4) as a result of the foregoing, the Individual Defendants overstated the prospects of the USFS awarding Compass Minerals a renewed contract for using the Retardant for the 2024 fire season; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Amended Incentive Plan; and (6) in light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false or misleading and lacked a reasonable basis at all relevant times.

186. In the exercise of reasonable care, Defendants Dowling, Dealy, Joyce, Miller, Reece, Wagnon, Walker, Gardiner, and Chisholm should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy

Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to the re-election of Defendants Dowling, Dealy, Joyce, Miller, Reece, Wagnon, and Walker to the Board and the approval of the Amended Incentive Plan.

187. The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of Defendants Dowling, Dealy, Joyce, Miller, Reece, Wagnon, and Walker to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the Amended Incentive Plan.

188. The Company was damaged as a result of Defendants Dowling's, Dealy's, Joyce's, Miller's, Reece's, Wagnon's, Walker's, Gardiner's, and Chisholm's material misrepresentations and omissions in the 2024 Proxy Statement.

189. Plaintiffs, on behalf of Compass Minerals, have no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

190. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

191. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Compass Minerals' business and affairs.

192. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

193. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Compass Minerals.

194. In breach of their fiduciary duties owed to Compass Minerals, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, in part, that: (1) testing of the Retardant had failed to establish it as a viable product, as its corrosive nature had not been successfully mitigated; (2) a successful pending Integrated Evaluation of its product was required to secure the Retardant's viability; (3) the USFS purchase for the 2023 fire season was not a commercial accomplishment by Compass Minerals, but a purchase made to conduct the Integrated Evaluation; (4) as a result of the foregoing, the Individual Defendants overstated the prospects of the USFS awarding Compass Minerals a renewed contract for using the Retardant for the 2024 fire season; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Amended Incentive Plan; and (6) in light of the above, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

195. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

196. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

197. In additional breach of their fiduciary duties, three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $609,421.

198. The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Compass Minerals' securities. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Compass Minerals' securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

199. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

200. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Compass Minerals has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

201. Plaintiffs, on behalf of Compass Minerals, have no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

202. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

203. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Compass Minerals.

204. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Compass Minerals that was tied to the performance or artificially inflated valuation of Compass Minerals or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

205. Plaintiffs, as shareholders and representatives of Compass Minerals, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

206. Plaintiffs, on behalf of Compass Minerals, have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

207. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

208. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

209. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Compass Minerals to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

210. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

211. Plaintiffs, on behalf of Compass Minerals, have no adequate remedy at law.

## FIFTH CLAIM

### Against Defendants Crutchfield, Dowling, Crenshaw, Hood, and Standen for Contribution Under Sections 10(b) and 21D of the Exchange Act

212. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

213. Compass Minerals and Defendants Crutchfield, Dowling, Crenshaw, Hood, and Standen are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Crutchfield's, Dowling's, Crenshaw's, Hood's, and Standen's willful and/or reckless violations of their obligations as officers and/or directors of Compass Minerals.

214. Defendants Crutchfield, Dowling, Crenshaw, Hood, and Standen because of their positions of control and authority as officers and/or directors of Compass Minerals, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Compass Minerals, including the wrongful acts complained of herein and in the Securities Class Action.

215. Accordingly, Defendants Crutchfield, Dowling, Crenshaw, Hood, and Standen are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section

21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

216. As such, Compass Minerals is entitled to receive all appropriate contribution or indemnification from Defendants Crutchfield, Dowling, Crenshaw, Hood, and Standen.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiffs may maintain this action on behalf of Compass Minerals, and that Plaintiffs are adequate representatives of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Compass Minerals;

(c) Determining and awarding to Compass Minerals the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Compass Minerals and the Individual Defendants to take all necessary actions to reform and improve Compass Minerals' corporate governance and internal procedures to comply with applicable laws and to protect Compass Minerals and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Compass Minerals to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Compass Minerals restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: July 30, 2025

Respectfully Submitted,

*/s/ Richard S. Fisk*
**BEAM-WARD, KRUSE, WILSON & FLETES, LLC**
Richard S. Fisk, KS #23712
8645 College Boulevard, Suite 250
Overland Park, Kansas 66210
Tel: (913) 339-6888
rfisk@bkwflaw.com

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
745 Fifth Avenue, Fifth Floor
New York, New York 10151
Telephone: (212) 935-7400
Email: bsachsmichaels@glancylaw.com

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067

Telephone: (310 201-9150
Email: rprongray@glancylaw.com
Email: prajesh@glancylaw.com

*Counsel for Plaintiff George Assad*

**WALTERS RENWICK RICHARDS SKEENS & VAUGHAN, P.C.**
Karen Wedel Renwick, D. Kan #12095
R. Frederick Walters, Ks. Dist. #70561
1100 Main Street, Suite 2500
Kansas City, Missouri 64105
Telephone: (816) 421-6620
Fax: (816) 421-4747
Email: krenwick@wrrsvlaw.com
Email: fwalters@wrrsvlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff Fabrizio Morelli*

# VERIFICATION

I, George Assad, do hereby verify that I am a holder of stock of Compass Minerals International, Inc., and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Amended Consolidated Stockholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 07/29/25

George Assad
George Assad (Jul 29, 2025 10:14:40 EDT)

George Assad

**VERIFICATION**

I, Fabrizio Morelli, am a plaintiff in the within action. I have reviewed the allegations made in this Amended Consolidated Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23__ day of July, 2025.

Firmato da:
[signature]
07F1680DFCFB43E...
Fabrizio Morelli